**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| MEMPHIS DISTRIBUTION PARTNERS, LLC,<br>Plaintiff,<br><br>v.<br><br>ELLIOTT AUTO SUPPLY CO., INC. d/b/a FACTORY MOTOR PARTS,<br>Defendant. | ) | No. 2:25-cv-02814-SHL-tmp |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Elliott Auto Supply's Motion for Summary Judgment, and Plaintiff Memphis Distribution Partners' Motion for Summary Judgment, both filed August 14, 2026.[1] (ECF No. 32; ECF No. 35.) Corresponding responses and replies have been filed. (ECF No. 42; ECF No. 44; ECF No. 46; ECF No. 48.) For the reasons stated below, both Plaintiff and Defendant's Motions for Summary Judgment are **DENIED**.

## I. BACKGROUND[2]

In May 2007, a lessor and lessee, neither of whom are parties to this case, entered into a lease agreement for property located at 633 Phelan Avenue in Memphis, Tennessee.[3] (ECF No. 43 at PageID 985–86.) This case is about that property's roof and HVAC systems, specifically at

---

[1] Defendant Elliot Auto Supply does business as "Factor Motor Parts." This Order refers to Defendant as "FMP" and Plaintiff as "MDPL."

[2] The following facts are undisputed unless stated otherwise.

[3] MDPL states that the lease agreement was executed on May 14, 2007, and FMP states that it was executed on May 16, 2007. (ECF No. 43 at PageID 985–86.) The exact date that the underlying lease was executed is immaterial here.

what point did the condition of each result in a default of the lease, and, depending on that timing, who is responsible for their repair and/or replacement.

Fast forward to October 2021. MDPL purchased the property from the prior owner. (Id.) (Id.) At that point, IEH Auto Parts Holding, LLC was leasing the property. (ECF No. 45 at PageID 1005.) So, by October 2021, MDPL and IEH were landlord and tenant, respectively, of the property. Before purchasing the property, MDPL received a Property Condition Report generated by Partner Engineering. (Id. at PageID 1006.) The Property Condition Report was commissioned by MDPL's lender, Wells Fargo, and was intended to "provide sufficient information to evaluate the condition of the real property in order to facilitate completion of due diligence as a secured lender." (Id. at PageID 1006; ECF No. 45-1 at PageID 1016.) The parties dispute the extent to which the Property Condition Report accurately reflected issues with the property's roof and HVAC systems. (ECF No. 45 at PageID 1006, 1011.) However, the Parties agree that MDPL received the Property Condition Report and declined to visit the property or obtain an additional roof inspection. (ECF No. 45 at PageID 1006.)

### A. Bankruptcy Proceedings

On January 10, 2023, IEH filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Texas.[4] (ECF No. 34 at PageID 516–27.) The Bankruptcy Court entered a Bid Procedures Order, which outlined numerous requirements related to the sale of IEH's assets. (Id. at PageID 415–23.) Some of those requirements governed the assignment and assumption of contracts like IEH's lease agreement with MDPL, which are referred to as designated contracts. (Id. at PageID 443–48.) Before IEH could assign its rights as lessee under

[4] The petition and the various orders entered by the Bankruptcy Court covered several other debtors in addition to IEH. However, no other debtor is involved in this case.

the lease with MDPL, it was required to notify MDPL of the assignment and provide a proposed amount to cure any potential defaults under the lease. (Id. at PageID 443.)

The Bid Procedures Order also outlined requirements for counterparties like MPDL. For instance, MDPL was required to file any objections to the cure amount in writing with the Bankruptcy Court and to serve those objections on counsel for the debtors and other individuals. (Id. at PageID 443–44.) Absent a timely objection,

> The Cure Amount for such Designated Contract shall be controlling, notwithstanding anything to the contrary in such Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors and their estates or any Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(Id. at PageID 446.) MDPL received notice of the Bid Procedures Order. (ECF No. 45 at PageID 1007.)

IEH notified MDPL of the potential assignment and assumption of their lease, proposed a cure amount of $0.00, and informed MDPL that failure to timely object would prevent it from asserting additional cure amounts or seeking other defaults. (Id.) The parties dispute whether MDPL objected to the $0.00 cure amount. (Id. at PageID 1008; ECF No. 34 at PageID 353, 357.) FMP asserts that MDPL did not object and MDPL contends that it objected in the amount of $233,163.98, which represented IEH's unpaid rent.[5] (ECF No. 45 at PageID 1008; ECF No. 34 at PageID 353, 357.)

On May 19, 2023, the Bankruptcy Court entered a Sale Order. The Order noted that "the Cure Amount set forth" in various exhibits, "[was] controlling, unless a noted Cure Dispute

[5] This dispute is immaterial because it does not involve contentions as to the then-current condition of the roof or HVAC systems.

exists," and that "[a]ny Cure Amounts associated with the Assumed Contracts" in the exhibits, "unless otherwise noted therein, ha[d] been paid." (ECF No. 34 at PageID 456.) Those exhibits listed MDPL's lease with IEH and a cure amount of $0.00. (Id. at PageID 460.) The Order made clear that, "[u]pon the Closing and payment of any Cure Amount, each non-Debtor party to an Assumed Contract or Assumed Lease shall be forever barred, estopped, and permanently enjoined from asserting against the Buyers . . . any default, breach, claims of pecuniary losses arising from the Assumed Contract." (ECF No. 34 at PageID 554.)

### B. Lease Agreement and Landlord Waiver

Following the sale, FMP assumed IEH's lease and entered a lease agreement with MDPL.[6] (ECF No. 45 at PageID 1009.) Section 2.01 of that agreement specified, in pertinent part, that

> Lessee acknowledges that it has received the Premises in good order and repair. Lessee, at its own expense, will maintain all parts of the Premises in good repair and condition and will take all action and will make all structural and nonstructural, foreseen and unforeseen and ordinary and extraordinary changes and repairs which may be required to keep all parts of the Premises in good repair and condition (including, but not limited to, all painting, glass, utilities, conduits, fixtures and equipment, foundation, roof, exterior walls, heating and air conditioning systems, wiring, plumbing, sprinkler systems and other utilities, and all paving, sidewalks, roads, parking areas, curbs and gutters and fences). Lessor shall not be required to maintain, repair or rebuild all or any part of the Premises. Lessee waives the right to require Lessor to maintain, repair or rebuild all or any part of the Premises or make repairs at the expense of Lessor pursuant to any Legal Requirement, Agreement, contract, covenant, condition or restrictions at any time.

(ECF No. 36-1 at PageID 726–27; ECF No. 43 at PageID 987.) A few weeks later, FMP and MDPL entered a Landlord Waiver, Estoppel and Agreement which stated that: (1) the lease is in full force and effect; (2) MDPL has no knowledge of any defense, offset, claim or counterclaim

[6] The parties have renewed the lease agreement twice, once on April 11, 2024, and again on April 3, 2025. (ECF No. 36-5; ECF No. 36-10). Neither renewal altered Section 2.01.

against FMP; (3) no notice of default has been given which has not been cured; and (4) MDPL had no knowledge of any other default in connection with the lease. (ECF No. 34 at PageID 463.) The Parties agree that "MDPL . . . represented that $0 was needed to cure any costs related to the property." (ECF No. 45 at PageID 1010.) Finally, the Parties do not dispute that MDPL did not evaluate the property's condition prior to signing the Waiver, Estoppel and Agreement. (Id.)

### C. FMP's Tenancy, MDPL's Lawsuit, and Counterclaims

So, by June 2023, FMP assumed IEH's lease, had become MDPL's tenant, and maintained a lease agreement and estoppel agreement with MDPL. Just under a year into FMP's lease, in April 2024, Donald Ball, MDPL's managing member, contacted J. Free, an FMP representative, and raised concerns about the property's roof. (ECF No. 34 at PageID 467.) In September of 2024, FMP had the property's HVAC systems assessed by a private company, which made recommendations for repairs and replacements. (ECF No. 43 at PageID 988.) FMP shared those recommendations with MDPL a month later, but FMP did not make the recommended repairs or replacements. (Id.) At the end of March 2025, issues with the roof and HVAC systems remained unaddressed, so MDPL notified FMP that it was in default under the lease agreement for "failure to maintain [the property] in good working order[,] [including] lack of repairs to the roof, air conditioner units and other fixtures associated with the [property]." (ECF No. 36-9 at PageID 802.)

On July 9, 2025, MDPL sued FMP in chancery court in Shelby County, Tennessee. (ECF No. 1 at PageID 1.) FMP removed the case to this Court. (Id.) MDPL sought (1) a declaration that the parties' lease agreement required FMP to perform repairs to the roof and HVAC systems, among other things; and (2) an order enforcing the lease agreement that reflected FMP's maintenance and repair obligations. (ECF No. 1-1 at PageID 14.) About a year

later, while the case was pending, MDPL replaced the roof. (ECF No. 36-11 at PageID 807–08.) MDPL then amended its complaint, again asking for a declaration that the Parties' lease agreement required FMP to perform repairs to the roof and HVAC systems, but now asserting a claim for reimbursement based on MDPL's replacement of the roof. (ECF No. 31 at PageID 247.) FMP responded with several counterclaims against MDPL.

### D. The Roof and HVAC Systems

Before turning to the analysis, an overview of the evidence submitted by the parties concerning the condition of the roof and HVAC systems, including the timeline related to the condition, is helpful. The parties offer the following related to the condition of the roof and HVAC systems: (1) the Property Condition Report; (2) the deposition of Aaron Kovan, Executive Director of Partner Engineering's parent company; (3) various depositions of individuals with purported knowledge of the roof and HVAC systems' conditions prior to FMP's assumption of the lease; (4) an FMP-commissioned report of the roof produced by Exponent, Inc.; (5) the deposition of Dr. Cliff Bishop, a structural engineer who worked on the Exponent report; (6) the deposition of Travis Todd, MDPL's roofing expert; and (7) the deposition of Cynthia Rapp, MDPL's HVAC expert. (See ECF No. 34 at PageID 508–15; 567–663; 668–99; ECF No. 45-1; ECF No. 45-2 at PageID 1107–1186; ECF No. 45-3 at PageID 1208–09.)

The Property Condition Report (the "PCR"), dated May 25, 2021, was prepared by Partner Engineering for MDPL's lender prior to MDPL purchasing the property. (ECF No. 45 at PageID 1006.) According to FMP, the PCR documented ponding and a clogged roof drain,

recommended monitoring and routine drain maintenance, and anticipated that the BUR roofing membrane[7] would need replacing during the report's five-year evaluation period. (Id.)

MDPL disputes FMP's reading of the PCR and adds details about the report as a whole. First, MDPL asserts that the PCR's evaluation period was twelve years, not five, and that the reference to five years relates to the PCR's estimation that the BUR roofing membrane would need to be replaced five years from the date of the inspection. (Id.) Second, although MDPL does not appear to dispute that the PCR noted ponding and a clogged roof drain, it highlights that the PCR did not associate a cost with those issues and instead stated that they could be addressed during routine maintenance. (Id.)

FMP deposed several individuals who worked at the property before FMP assumed the lease. Based on those depositions, FMP asserts that, before it assumed the lease, "the roof had experienced recurring leaks for many years[,] and the HVAC unit had consistent recurring problems with operability and inadequate cooling and airflow. IEH employees placed buckets and containers beneath leaks and cleaned water from the warehouse floor when it rained." (Id. at PageID 1011.)

MDPL disputes these assertions. According to MDPL, FMP did not report any deficiencies with the roof or HVAC systems until April 2024, when FMP had already assumed the lease. (Id.) Additionally, MDPL, relying on the PCR, argues that, as of May 2021, "there were no immediate repairs necessary to maintain the roof or HVAC system. In its long-term cost opinion, the Partner Report stated that three HVAC units would need to be replaced in four

[7] A BUR roof is a built-up roof system, containing layers of rubberized asphalt. (See ECF No. 45-2 at PageID 1115.)

years, five years, and six years, respectively and that the BUR membrane would need to be replaced in five years." (ECF No. 45-1 at PageID 1015; ECF No. 45 at PageID 1011.)

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if "proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012) (citing Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)). Facts in the record and reasonable inferences that can be drawn from those facts are viewed in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party opposing summary judgment must show that there is a genuine dispute of material fact by either pointing to evidence in the record, or arguing that the movant is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, a court's role is not to weigh evidence or assess the credibility of witnesses, but simply to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Kroll v. White Lake Ambulance Auth., 763 F.3d 619, 623 (6th Cir. 2014) (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 251–52).

## III. ANALYSIS[8]

1. FMP's Motion for Summary Judgment

FMP presents two arguments in support of its Motion. First, FMP contends that the adjudication of IEH's bankruptcy petition forecloses MDPL's claims for roof and HVAC repairs under the doctrine of res judiciata. (ECF No. 33 at PageID 300–10.) Second, FMP asserts that, res judicata aside, the Landlord Waiver and Estoppel Agreement bars MDPL's claims for roof and HVAC repairs. (Id. at PageID 310–11.)

In response, MDPL concedes that the Bankruptcy Court's Sale Order prevents it from holding FMP responsible for IEH's defaults. (ECF No. 44 at PageID 993.) But MDPL asserts that its claims, properly construed, relate only to FMP's post-assumption duties and subsequent breach of those duties. (Id. at PageID 999.) As such, MDPL argues, its claims fall outside of the Bankruptcy Court's Sale Order and are not barred under res judicata. (Id.) Similarly, MDPL contends that the Landlord Waiver and Estoppel Agreement only certified that, on the date it was signed, MDPL had no knowledge of any default by FMP. (Id. at PageID 1001.) Finally, MDPL asserts that genuine disputes of material fact relating to the timing and causation of the deterioration of the roof and HVAC systems preclude summary judgment.

a. Res Judicata

Res judicata "prevents parties from litigating matters that 'should have been advanced in an earlier suit." Wheeler v. Dayton Police Dept., 807 F.3d 764, 766 (6th Cir. 2015) (citation omitted). Res judicata applies when "the following circumstances are present: '(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the

[8] Any inference to be drawn is drawn in favor of MDPL, for purposes of FMP's Motion, and vice versa, for purposes of MDPL's Motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).

same parties or their "privies"; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.'" Brown v. Shelby Cnty. Schs., No. 2:24-cv-02571-SHL-atc, 2025 WL 2603060, at *1 (W.D. Tenn. Sep. 9, 2025) (quoting Bittinger v. Tecumseh Prod. Co., 123 F.3d 877, 880 (6th Cir. 1997)). Generally, "an order approving the sale of assets in bankruptcy is . . . a final order, the execution of which precludes further litigation regarding those assets." In re HNRC Dissolution Co., 761 F. App'x 553, 564 (6th Cir. 2019) (citation omitted). However, "res judicata cannot bar a subsequent suit alleging new misconduct." Stanislaw v. Thetford Twp., No. 20-1660, 2021 WL 3027195, at *4 (6th Cir. July 19, 2021) (citations omitted).

Here, an exhaustive examination of res judicata principles is unnecessary. For one, the parties agree that the Bankruptcy Court's Sale Order prevents MDPL from recovering from FMP for pre-assumption defaults committed by IEH. (Compare ECF No. 33 at PageID 300–10 (arguing, in part, that res judicata bars pre-assumption defaults), with ECF No. 44 at PageID 999 ("MDPL does not dispute that the Sale Order constitutes a final decision on the merits for res judicata purposes or that it bars MDPL from bringing claims for pre-assumption claims.") Their agreement is supported by well-settled case law. See, e.g., Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 578 (6th Cir. 2008) ("We join other circuits in holding that a bankruptcy court's sale order is a final order for res judicata purposes."); In re Baudoin, 981 F.2d 736, 742 (5th Cir. 1993) ("[B]ankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for res judicata purposes."); accord In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458, 463 (6th Cir. 1991) ("Confirmation of a plan of reorganization by the bankruptcy court . . . bar[s] relitigation of any issues raised or that could have been raised in the confirmation proceedings.").

And the language of the Sale Order itself leaves little room for debate. It states that "the Cure Amount . . . shall be controlling . . . and the Counterparty," in this instance, MDPL, "shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such . . . [c]ontract[s] against . . . any Winning Bidder," in this instance, FMP. (ECF No. 34 at PageID 446.) In other words, the Sale Order bars MDPL's claims to the extent they seek recovery from FMP for a default that existed at the time of the Sale Order.

Based on the Parties' submissions, and mindful that facts in the record and reasonable inferences that can be drawn from those facts are viewed in the light most favorable to the nonmovant, a genuine dispute of a material fact as to when the repairs and/or replacement was necessary renders summary judgment improper. Specifically, if the need for repairs and/or replacement existed prior to the Sale Order, as argued by FMP, MDPL has no claim for breach against FMP. Conversely, if the work was not needed until after FMP assumed the lease, then FMP may have breached the agreement.

The Parties have presented competing evidence surrounding the condition of the Roof and HVAC systems. FMP submitted evidence that the roof experienced recurring leaks for years prior to FMP's tenancy and had been in a state of "long-term deterioration" since 2018. (ECF No. 45 at PageID 1011.) MDPL, on the other hand, submitted the Property Condition Report, and relies on its recommendation that repairs were not immediately needed. (ECF No. 45-1 at PageID 1022–23.) Additionally, MDPL points to a lack of leaking noted in the Property Condition Report. (Id. at PageID 1036.)

As far as the HVAC systems, the Parties have similarly submitted conflicting evidence. FMP maintains that the HVAC systems "had consistent recurring problems with operability and inadequate cooling and airflow," pointing to the depositions of various individuals who worked

on the property prior to FMP's assumption of the lease. (ECF No. 45 at PageID 1011; see also ECF No. 34 at PageID 572, 582, 594.) MDPL offers competing evidence, like the Property Condition Report, to show that the HVAC units were not in need of repair in May 2021. (ECF No. 45 at PageID 1011.) Additionally, some of the individuals who worked on the property prior to FMP's assumption of the lease offered equivocal testimony about the HVAC systems, and do not establish conclusively whether significant problems existed when FMP assumed the lease. (See, e.g., ECF No. 34 at PageID 582, 592, 603.)

The conflicting evidence related to the roof and HVAC systems shows that genuine issues of material fact exist. However, MDPL is cautioned that this conclusion results, in substantial part, from the presumption that it is entitled to as the nonmoving party. As far as the evidence goes, FMP has provided much more information regarding the problems with the roof pre-dating the Sale Order. MDPL should be mindful of this as trial approaches. At the same time, trial will provide the Court an opportunity to assess for itself the credibility of the evidence.

Regardless, a genuine dispute of fact exists regarding when the roof and HVAC systems were in such a state of disrepair as to constitute an event of default under the lease agreement. This fact is material because, "proof of [it] would establish or refute an essential element of the cause of action or defense." Bruederle, 687 F.3d at 776 (citation omitted). In other words, the roof and HVAC systems were in such a state of disrepair to constitute a default under the lease either before FMP's assumption or after FMP's assumption. If a default existed before FMP's assumption, then MDPL's claim for reimbursement would be barred under res judicata principles, as the Parties agree. (See ECF No. 33 at PageID 300–10; ECF No. 44 at PageID

999.) Alternatively, assuming but not deciding[9] that the lease agreement imposes a duty on FMP to maintain the premises, if the default happened after FMP's assumption, then FMP would be liable for repayment of the roof and repairs of the HVAC systems. (ECF No. 43 at PageID 987.)

b. The Landlord Waiver Agreement

The Landlord Waiver, Estoppel and Agreement states, in pertinent part, that

> [MDPL] is the landlord under the Lease, . . . the Lease is in full force and effect and has not been amended, modified or supplemented, . . . [MDPL] has no knowledge of any defense, offset, claim or counterclaim by or in favor of [MDPL] against [FMP] under the Lease or against the obligations of [MDPL] under the Lease, . . . no notice of default has been given under or in connection with the Lease which has not been cured and [MDPL] has no knowledge of the occurrence of any other default under or in connection with the Lease.

(ECF No. 34 at PageID 463). As outlined above, the Parties' both interpret this provision to be a certification by MDPL that (1) the lease is in full force and effect; (2) MDPL has no knowledge of any defense, offset, claim or counterclaim against FMP; (3) no notice of default has been given which has not been cured; and (4) MDPL had no knowledge of any other default in connection with the lease. (Id.)

FMP argues that MDPL is barred from bringing claims to recover for default "it certified did not exist." (ECF No. 33 at PageID 310.) MDPL argues that the agreement "certified only what MDPL . . . knew" at the time it signed the agreement, and that it had no knowledge of any default when the agreement was signed.[10] (ECF No. 44 at PageID 1001.)

---

[9] In MDPL's Motion for Summary Judgment, it argues that it "is entitled to a declaration that Section 2.01 of the lease is enforceable and [that] [it] is entitled to damages incurred from repairing the roof." This argument is addressed below.

[10] MDPL offers other arguments in opposition to FMP's Motion. However, because FMP's motion can be fully disposed of due to the existence of genuine disputes of material fact, those other arguments are not addressed here.

The Landlord Waiver Agreement functions similarly to the Bankruptcy Sale Order. Like the Bankruptcy Sale Order, the Landlord Waiver Agreement employs clear language. It certifies that, on June 23, 2023, when the Parties signed the agreement, MDPL was unaware of any defaults existing at that time. So, FMP's Landlord Waiver Agreement argument fares the same as its res judicata argument. That is, summary judgment is appropriate only if no genuine dispute of material fact exists over the timing of issues with the roof and HVAC systems. However, as explained above, this is not the case.

For the reasons outlined above, genuine disputes of material fact exist as to the condition of the roof and HVAC systems at the time FMP assumed the lease. Therefore, FMP's Motion for Summary Judgment is **DENIED**.

2. MDPL's Motion for Summary Judgment

In its Motion, MDPL argues that it "is entitled to a declaration that Section 2.01 of the lease is enforceable and [is] entitled to damages incurred from repairing the roof, as well as an order directing FMP to perform repairs on the HVAC system." (ECF No. 35 at PageID 713.) For the same reasons outlined above, MDPL's Motion is **DENIED** to the extent it requests damages incurred from repairing the roof and an order directing FMP to repair the HVAC systems. Genuine disputes of material fact remain on these issues.

Additionally, MDPL's request that the Court declare Section 2.01 enforceable seems premature. At this stage in the litigation, the meaning of Section 2.01 is beside the point. In its Amended Complaint, MDPL seeks "a declaration that . . . [Section] 2.01 of the Lease requires [FMP] to perform the necessary repairs to the structure and roof, together with other fixtures, including the [HVAC] system[s], which are in need of repair." (ECF No. 31 at PageID 246.) Additionally, MDPL seeks "an order . . . requiring FMP to reimburse MDPL for the cost of the

repairs to the roof." (Id. at PageID 247.) Were this "a simple commercial lease dispute in which a landlord seeks reimbursement for repairs," MDPL would be on more solid footing. (ECF No. 42 at PageID 972.) Such is not the case here. The meaning of Section 2.01 only matters to the instant dispute if MDPL can meet its burden of showing that the roof and HVAC systems entered their purported state of disrepair after FMP became lessee. And, at this point, that very issue, as outlined above, is a genuinely disputed fact issue. Therefore, MDPL's Motion is also **DENIED** to the extent it seeks a declaration that Section 2.01 of the lease is enforceable.

For the reasons outlined above, genuine disputes of material fact exist as to the condition of the roof and HVAC systems at the time FMP assumed the lease. Therefore, MDPL's Motion for Summary Judgment is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, both Parties' Motions for Summary Judgment are **DENIED**. At trial, the Parties should be prepared to address the fact issues about the condition of the property's roof and HVAC systems, specifically, the timing of the conditions.

**IT IS SO ORDERED**, this 19th day of October, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE